**SO ORDERED: August 21, 2013.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARY E. KNIGHTON and | ) | Case No. 07-08826-JKC-11 |
| SCOTT K. KNIGHTON, | ) | |
| | ) | |
| Debtors. | ) | |

**ORDER DENYING MOTION FOR THE HONORABLE JAMES K.  COACHYS**
**TO RECUSE FROM THIS CAUSE PURSUANT TO 28 U.S.C. § 455(a) and (b)(1)**

This matter comes before the Court on Thomas B. O'Farrell, Heather E. O'Farrell (the "O'Farrells") and McClure & O'Farrell, P.C.'s (together, the "Firm") Motion for the Honorable James K. Coachys to Recuse From This Cause Pursuant to 28 U.S.C. § 455(a) and (b)(1) (the "Recusal Motion").  Following a hearing on July 31, 2013, the Court took the matter under advisement and now issues the following Order.

**Procedural History**

The Court begins by setting out the rather long and involved procedural history that precedes the Firm's Recusal Motion.  On September 13, 2007, Mary and Scott Knighton (the "Knightons")

filed a voluntary Chapter 11 petition (the "Knighton 11") under Case No. 07-08826-JKC-11.  The

Knightons were represented by Mr. O'Farrell and Alfred B. McClure, both of McClure & O'Farrell,

P.C.  On Schedule A of the petition, the Knightons listed their residence at 23998 Twilight Hills,

Cicero, Indiana 46034 (the "Property") as an asset of the estate and valued the property, per an

appraisal, at $290,000.00.  On December 12, 2007, CitiMortgage, Inc. ("Citi") filed a secured claim

with respect to the Property in the amount of $118,797.29.  No objection to that claim was ever

posed.

On November 7, 2008, the Knightons filed an Amended Application to Sell Property Free

and Clear of Liens pursuant to 11 U.S.C. § 363(f)(3) (the "Amended Sale Motion"),[1] wherein they

sought to sell the Property free and clear of liens and encumbrances for $150,000.00 to Phillip D.

Roudebush and Sara S. Roudebush (the "Roudebushes").  The Amended Sale Motion also stated that

the sale proceeds "shall be deposited in a segregated account, to which any and all valid liens will

attach, subject to distribution upon further order of the Court."  Counsel for Citi was served with the

Amended Sale Motion and did not object.

Following a hearing on November 20, 2008, at which counsel for the Knightons, Citi and the

United States Trustee appeared, the Court issued an order granting the Amended Sale Motion (the

"Sale Order").  Admittedly, the Sale Order,[2] was not particularly well crafted in that it did not

explicitly restate all of the terms of the Amended Sale Motion.  Instead, it stated that the Amended

Sale Motion was "granted" and further provided that the sale proceeds were to be placed in a

---

[1] In an Order dated January 28, the Court mistakenly indicated that the Amended Sale Motion was
filed on September 9, 2008.  That was the date that the Knightons filed their original sale motion (although
it, too, is titled "Amended Application" for some reason).

[2] The Sale Order was an order proposed by the Firm.

2

"segregated account for distribution only pursuant to further order of the Court."[3]   While the Knightons never filed a formal report of sale, the Property was apparently sold to the Roudebushes for the sum of $147,831.68, with a check made payable to the Knightons and the Firm (the "Sale Proceeds").

Following issuance of the Sale Order, very little additional activity transpired in the case–at least according to the Court's docket–until Citi filed a Motion for Relief from Stay and to Abandon Real Estate or in the Alternative Adequate Protection (the "Chapter 11 Stay Motion") on February 27, 2009.  In the Chapter 11 Stay Motion, Citi asserted that the Knightons had defaulted on their post-petition payments to Citi for the period October 1, 2007 through February 1, 2009.  No mention was made in the Chapter 11 Stay Motion that the Property had been sold free and clear of Citi's mortgage.  The Knightons objected, asserting that the Property had been sold and was no longer property of the estate.  No mention was made in the objection that Citi had a lien on the Sale Proceeds or that there was any dispute between the parties as to Citi's entitlement to them.

The Court set the Chapter 11 Stay Motion and the objection thereto for hearing, but the hearing was continued multiple times at the Firm's request.  Meanwhile, the United States Trustee moved for dismissal of the case on April 7, 2009, based on the Knightons' nonpayment of fees to be paid to the United States Trustee (the "Dismissal Motion").  The Court noticed the Dismissal Motion to all creditors and parties in interest and set the matter for hearing on April 30, 2009.  The Chapter 11 Stay Motion was also reset to be heard that same day.

In advance of the hearing, and with no objection to the Dismissal Motion having been filed

---

[3]  There was no discussion at the November 20th hearing as to what form "further order of the Court" would take, but given that the Knightons had already stated an intention to file a Chapter 11 plan, the Court presumed that the sale proceeds would be distributed according to the terms of a confirmed plan.

by the Knightons or any other party, Mr. McClure informed the Court by telephone that the case could be dismissed. Consistent with that, the Court vacated the April 30th hearing and immediately dismissed the case. Following dismissal, the Court was unaware of any further litigation between the Knightons, the Firm, Citi and/or the Roudebushes until December of 2012–as detailed below.

On June 18, 2012, the Knightons filed a voluntary Chapter 7 bankruptcy petition with the assistance of counsel, Tom Scott & Associates, under Case No. 12-07266-JKC-7 (the "Knighton Chapter 7"). On December 6, 2012, the Roudebushes filed a Motion to Clarify Court's Order (the "Clarification Motion") that brought to this Court's attention some troubling developments that allegedly transpired after dismissal of the Knighton Chapter 11 case. The Court set a hearing on the Clarification Motion for December 13, 2012.[4]

In reviewing the Clarification and Stay Motions, the Court recognized that the Firm might have some information to share that could potentially help clarify what happened after dismissal of the Knighton Chapter 11. The Court, through staff counsel, contacted the Firm by telephone and eventually talked to both Ms. O'Farrell and Mr. McClure in an effort to inform them of the hearing.

---

[4] Prior to the filing of the Clarification Motion, Citi filed a Motion for Relief from Stay and Abandonment in the Knighton Chapter 7 on September 12, 2012. The Chapter 7 Trustee objected to the stay motion and alleged many of the same things that the Clarification Motion later did. On September 26, 2012, the Roudebushes also moved for stay relief, to which the Chapter 7 Trustee also objected (together, Citi's and the Roudebushes' stay motions in the Knighton Chapter 7 shall be referred to as the "Chapter 7 Stay Motions"). The Court set the Chapter 7 Stay Motions and the objections thereto for a hearing on November 5, 2012. Such hearing was then continued to December 13, 2012, at the Trustee's request.

While the Court scheduled a hearing on the Chapter 7 Stay Motions, as it routinely does when an objection to such relief is posed, because the matters were continued in advance of the hearing, it did not formally review them until it prepared for the December 13, 2012 hearing. By that time, the Clarification Motion was on also file, and it was *that* motion that first alerted the Court to the controversy over the Sale Proceeds and Sale Order.

Staff counsel also sent an email to Mr. O'Farrell on December 10, 2012, stating:[5]

> Thanks for calling me back. Unfortunately, no one is picking up your cell phone number, and it won't let me leave a voicemail. So, I thought I'd leave an email message on the matter for which I'm calling.
>
> You and your firm handled the above-referenced Chapter 11 case back in 2007. In the course of that case, your clients sold their residence by way of Section 363(f), free and clear of CitiMortgage's and LaSalle Bank's mortgages on the property. The mortgages instead attached to the sale proceeds, which were sufficient to pay off both mortgages and which you agreed to hold in escrow pending their distribution.
>
> The case was then involuntarily dismissed, with a motion for relief from stay from Citi pending at the time. Citi has since proceeded with a foreclosure action in state court, with the buyers of the property ultimately interpleading. Your debtors, the Knightons, have now filed a Chapter 7 case under Case No. 12-07266 to stop the foreclosure proceeding. Various questions have been raised in the new case as to what happened to the sale proceeds. Debtor indicated in their schedules that they did not receive any of them, and it would appear that neither did Cit[i] or LaSalle.
>
> We have a hearing set this Thursday at 1:30 on a motion by the buyers of the real estate to clarify that the sale to them was, in fact, free and clear. The Court is not ordering you to appear at that hearing, but it would seem--based on what is before the Court already--that we will likely need to formally hear from you at some point as to the proceeds. So, if you can make the hearing, that might expedite resolution of the matter. We may have to reopen the 2007 case if [there] are funds that need to be administered or any other relief requested or ordered.
>
> Please let me know how you with to proceed and/or if you have any questions.
>
> Thank you.

Consistent with the email, the Court conducted a hearing on the Clarification Motion and Chapter 7 Stay Motions on December 13, 2012, at which counsel Tammy Lynn Ortman for the Roudebushes, David H. Yunghans for Citi, and Jeannette E. Hinshaw for the United States Trustee appeared, as

---

[5] The Court notes that the Firm was listed as a creditor in the Knighton Chapter 7 and, as such, received notice of some of the activity within the case, e.g., the 341 meeting notice and Citi's request for relief from the stay and for abandonment. Consistent with standard procedure, the Firm did not get notice of the hearings on the Stay Motion or Clarification Motion, nor were they served with a copy of the Trustee's objections or the Roudebushes' request for stay relief (because it did not also seek abandonment).

did Deborah J. Caruso, the Chapter 7 Trustee in the Knighton Chapter 7.  No one from the Firm was present. At the hearing, the Court learned for the first time that the O'Farrells had filed a Chapter 7 petition in this district on October 16, 2012 and that such case was pending before the Honorable Robyn L. Moberly.[6]

What further transpired at that hearing and immediately thereafter is largely the basis for the Recusal Motion.  In the interest of providing an accurate and complete depiction of that hearing, nearly the entire transcript follows:[7]

THE COURT: Well, can somebody enlighten me as to what the heck is going on?

MS. CARUSO: I would be happy to. Just for a little bit of background, Your Honor, and I'm sure you've read the pleadings that we filed here, but this case emanates from a case that was filed by the Knightons in 2007.  It was a Chapter 11 case that was filed in this court.  The court issued an order pursuant to motion to authorize the sale of the Knightons' house to the Roudebushes.  The sale was for $150,000 and the motion requests that the sale be under 363, free and clear of all liens and encumbrances. That's the last the court knew of the case because it was dismissed for the debtors' failure to do a lot of things.  Anyhow, fast forward to this year and the Knightons filed a Chapter 7 bankruptcy proceeding. I am the trustee. In connection with the administration of that estate, I learned that the $150,000, it was about 147 net, proceeds, was deposited into Mr. O'Farrell's account, trust account in 2007.  It was never disbursed.  So what happened after that was, CitiMortgage filed a foreclosure proceeding against the house that was sold to the Roudebushes who, by the way, paid cash at closing.  And there was actually a judgment of foreclosure issued. The Roudebushes are now represented. That has been stayed in the Hamilton County Court and with much persistence, Mr. O'Farrell finally deposited 95,000 thereabouts -- $93,000, with the Clerk of the Hamilton County Court.  He's never made an accounting, he's never explained where the other $56,000 has gone.

THE COURT: Did he do that pursuant to an order out of that court?

MS. ORTMAN: There's an order sitting that he has not answered.  He has continued twice but

---

[6]  The O'Farrells' Chapter 7 is under Case No. 12-12312-JKC-7A.

[7]  The only part of the transcript from the December 13th hearing deleted, above, pertains to counsels' appearances at the commencement of the hearing and to the Court's attempt near the conclusion of the hearing to find a viable date to reschedule the Clarification Motion.  The full transcript of the hearing is available on the docket for the case.

there's been no material response.

MS. CARUSO: So did he voluntarily --

MS. ORTMAN: Yes.

THE COURT: No, how did the money get from him to the clerk?

ORTMAN: He voluntarily deposited at a summary judgment hearing that was postponed, upon order that he deposit the proceeds and ninety-two of which were deposited.

MS. CARUSO: Mr. O'Farrell has filed bankruptcy. It's pending in Judge Moberly's court. He has not filed any 7 schedules. He has -- the 341 has been continued until January.

THE COURT: He's filed personally?

MS. CARUSO: Mr. O'Farrell, personally, with his wife. And by the way, his wife is also a lawyer who, which Jeannette just informed me today, if you recall our flat fee discussion --

THE COURT: Yes, I recall that.

MS. CARUSO: -- the O'Farrell case, that is his wife.

THE COURT: Yes, I know.

MS. CARUSO: Okay. So, anyway, where we are today, the issues are, Your Honor, Number 1, should there be a foreclosure when there was a 363 sale ordering the house sold free and clear of liens and is the mortgage company's remedy against the proceeds. I think we all agree to that. There should not be a foreclosure. The Roudebushes are a good faith purchaser and they own the house. [The o]ther issue is the $94,000 sitting in the Hamilton County Clerk's office, who is entitled to that money. When the case was -- the Chapter 11 case was going on, if the mortgage company would have been paid their claim was $118,000, the debtors had an exemption of $30,000. If Mr. O'Farrell would have distributed this money, the mortgage company would have been paid in full, debtors would have received 30,000. As their trustee, I stand in their shoes for that claim and they have waived any right to an exemption. So we have agreed to file the appropriate pleadings in the Hamilton County Court to transfer the $94,000 to the trustee's account. And we will discuss how that money should be distributed and, obviously, we would have to do that pursuant to an order that would be entered by this court. I think the issues with that are, we need to talk to Mr. O'Farrell. Number 1, are those the proceeds from the sale; Number 2, where is the rest of the money. Are there any malpractice claims against Mr. O'Farrell that we can recover and is there dischargeability of funds.

THE COURT: Okay. Schedules have not been filed in his bankruptcy.

7

MS. CARUSO: No.

THE COURT: You don't know who he listed as creditors.

MS. CARUSO: Don't know. I don't know what assets he has either.

MS. HINSHAW: Correct, Your Honor.  The schedules are due on January 4th and then that's when the continued 341 is.

THE COURT: Is that a 7?

MS. HINSHAW: Yes.

THE COURT: Who's the trustee?

MS. HINSHAW: The trustee is Jenice Golson-Dunlap.  I've spoken with her and she's aware that it's going to be a – not a routine case. And I, as well as Ms. Caruso, am planning to attend the 341 to get direct responses regarding exactly these questions and then if -- the questions will either be answered or Mr. O'Farrell will plead the fifth in which case we'll take things from there.

THE COURT: Okay. Does the -- okay. So you've agreed that the foreclosure is not going to continue? I mean right now, there's apparently -- apparently, there's a motion to set aside the summary judgment order on foreclosure there, right? That's pending.

MR. YUNGHANS: Your Honor, our firm, actually is not handling the foreclosure. I just received a referral to do the motion for relief.  But certainly my advice to CitiMortgage is, they should not be continuing with the foreclosure at this time. Ms. Ortman, who is the counsel working? It's Feiwell & Hannoy, I believe, is continuing with the foreclosure.

MS. ORTMAN: Feiwell.

THE COURT: Yes, I guess -- I mean they were -- you were represented, in fact, in the old case, the '07 case. They were represented at the hearing when I approved the sale. So then, why wouldn't CitiMortgage go after the proceeds, rather than file a foreclosure a few months later? Does anybody know?

MS. ORTMAN: Your Honor, I have no idea, the answer to your question. But the foreclosure action was pending and then stayed when the Knightons filed their original petition.

THE COURT: So it was [on] file[] before the '07 case was 7 filed?

MS. ORTMAN: It was, yes. It was filed in '06. When the stay was lifted and the case was dismissed, then Citi filed its summary judgment motion to foreclose. But Citi at that time had actual knowledge

one, of the order it agreed to sell free and clear of liens and two, of my clients' VFP's. So the foreclosure decree was entered with no notice to my clients and their first news that any of this had transpired was the notice of sheriff's sale on their door. And we've been litigating a motion to set aside and for an accounting of proceeds since March of this year, with no forward motion.

THE COURT: So does the '07 case need to be reopened?

MS. ORTMAN: I don't know that reopening, if you would put the order in a recordable form that I could deliver to the Hamilton County and the recorder that would actually release the liens so that we could terminate --

THE COURT: Which order, the original order?

MS. ORTMAN: Yes, Your Honor.

THE COURT: So you would just need to get a certified copy?

MS. HINSHAW: There is a mechanism for doing exactly that.

MS. ORTMAN: It's not in recordable form as I have read it. I would be happy to do an amendment or --

MS. HINSHAW: You go through a certification process with the clerk's office. I had to do that when I was in private practice.

THE COURT: Yes, but you're saying the form of the order.

MS. ORTMAN: -- just need another order --

THE COURT: The form of the order isn't correct, is that it?

MS. ORTMAN: Sufficient for the recorder to take it.  It doesn't identify the instrument number of the mortgage being released, of CitiMortgage. And a number of assignments that were between the original grant.

MS. CARUSO: But CitiMortgage, the other counsel, they're not here today so, obviously, they're not disputing that the foreclosure shouldn't go forward, right? I don't see that this is --

MR. YUNGHANS: I mean to me it seems like they -- that's what he has been doing. He's still disputing that.

MS. CARUSO: I filed a motion --

MS. YUNGHANS: Is whole issue -- are they waiting for an order from bankruptcy court, then, that releases -- orders them to release the lien?

MS. ORTMAN: That already exists, so I can't answer. I'm not --

MS. CARUSO: Do you guys talk? Because you're representing the same client.

MR. YUNGHANS: I have not talked to foreclosure counsel, no. I have not.

MS. CARUSO: Okay, okay. So that's why -- I mean, I was assuming we'd have an agreement but that's why you believe you need this order to go forward in the event that foreclosure counsel doesn't agree that the foreclosure should be dismissed.

MS. ORTMAN: Correct.

MR. YUNGHANS: Yes.

MS. CARUSO: All right. But if you can speak for CitiMortgage that the funds should be transferred?

MR. YUNGHANS: Yes.

MS. CARUSO: Okay.

MR. YUNGHANS: Yes.

MS. CARUSO: I mean, I think we can do that --

THE COURT: But if you need that order amended, basically, or corrected, it seems to me we need to reopen that case. You need to file something there, and assuming nobody is going to object to it and you get an order, the type of order that's needed to at least get them -- get their title clear, right?

MS. ORTMAN: I wouldn't pretend to know the procedure here, but either a ministerial amendment to that previous order, which would just do nothing more than include the instrument numbers and the dates of execution and recording, would suffice the recorder.

THE COURT: No, I understand, but I can't just -- it's a closed case. I can't just issue an order out of it. I mean, we'[ve] got to reopen it.

MS. ORTMAN: Which is why I filed the motion to clarify the order in this particular case if that --

THE COURT: Right. But that doesn't reopen the '07 case. I think something needs to be filed and to reopen -- I think. I mean, you guys tell me if you think something different, but I think we need to reopen -- the motion to reopen, that needs to get reopened, then a motion to amend that order,

whatever. I don't think it's really a clarification of the order, it's probably an amendment to the order.

MS. CARUSO: Well, you know, Your Honor, I believe that that order is not a judicial estoppel argument with the state court.

MS. ORTMAN: I believe you're correct.

MS. CARUSO: Have you tried to assert that in the state court?

MS. ORTMAN: I have. Our motion is pending and was continuing in the state court action, was stayed because of the Knightons and the O'Farrell bankruptcy cases.

MS. CARUSO: I really believe if you look at the motion and that order, it says it's sold free and clear of all liens and encumbrances.

THE COURT: Yes. The order is not --

MS. CARUSO: It's not --

THE COURT: -- a work of art but it does refer to the motion. You really need to look at the motion to see what the order is.

MS. CARUSO: Is it possible you could approach that with the state court and if they feel they need a more comprehensive order, then move to reopen that '07 case?

MS. ORTMAN: Yes, if we were allowed to continue in the state court proceeding.

MS. CARUSO: And I don't have a problem, the only issue I raised with objections to the relief from the stay was with respect to abandonment of the funds. So if the funds aren't going to be abandoned and we're going to --

THE COURT: Now, you're talking about the Roudebushes' relief from stay motion.

MS. CARUSO: Yeah. If the Roudebushes want to go to the state court and --

THE COURT: No, I understand that.

MS. CARUSO: -- yeah, I'm all right that.

THE COURT: So what I suppose I need is, I'll grant that motion but apparently it should have some language in it about where the money is going and then you can then continue to pursue your motion to set aside the judgment there.

MS. CARUSO: All right.

THE COURT: If you need something else, other than what you already have out of that prior case, I think we need to reopen it.

MS. CARUSO: And I think what I will do, if we -- I would like to have an agreement that we can present to the state court for transfer of the funds and that would probably entail a global agreement that the case has been dismissed and the funds are going to be transferred. If we can't have -- what I said, Your Honor, I would like -- it would be nice if we could have a global agreement, talk to foreclosure counsel where we would dismiss that state court case.

THE COURT: Is that Feiwell & Hannoy?

MS. CARUSO: Yes.

MS. HINSHAW: Your Honor, if I -- I'm sorry to interrupt.

MS. CARUSO: No, that's okay.

MS. HINSHAW: I didn't know if there were any openings for something like a telephonic status conference on Citi's motion for relief from stay where, for instance, Randy Eyster, who I believe is the head person in the bankruptcy department at Feiwell, if he were directed by the Court to be on the phone, that might help communication. Just an idea.

THE COURT: I mean, we could try. I mean, he may not have a clue what's going on, though, other than them pursuing the foreclosure, I don't know. I mean, maybe they do know.

MS. ORTMAN: Feiwell represented the bankruptcy of Citi -- I'm sorry, represented the Knightons' bankruptcy interest in Citi's benefit out of that mortgage in the underlying bankruptcy.

THE COURT: Right.

MS. ORTMAN: So they would have participated.

THE COURT: I know. Yes, I know. It was John Joseph, though, and he's --

MS. CARUSO: I know you don't represent foreclosure -- you're not foreclosure counsel but to me it seems like the longer this goes on, there's already a counterclaim and a cross-claim against CitiMortgage. They're just treading on very thin ice here.

MR. YUNGHANS: Well, just generally, I think they just probably have two different areas that their -- you know, their bank, working the file. So they have, on one hand filing a foreclosure --

12

THE COURT: Yes. Of course, then hiring two different lawyers, that's their problem. I mean, they're the ones that participate -- not only got notice, they were here.

MR. YUNGHANS: But ideally, what I'm going to do when I get back is, I'm going to change this over to a litigated file and basically when that -- they send that to Citi, it goes to a different department. And that department usually can -- they'll combine everything together and then they will -- I –

MS. CARUSO: What does that do for us?

MR. YUNGHANS: I think it would -- it would stop having two firms working the file. That would be the first thing it would stop. And it would probably even be transferred to us or transferred to them.

THE COURT: Well, what do you want me to do with CitiMortgage's motion for relief from stay?

MS. CARUSO: Deny it. I think their motion for relief from stay should be denied because I see that that is just really directed to the only asset that we have in this case, which is the funds. The house has been sold.

THE COURT: Yes, it is. What's your position on that?

MR. YUNGHANS: Your Honor, at this time we don't want relief, we want to resolve this in the bankruptcy court. So we want to -- we don't want the asset, the proceeds, to be abandoned by Citi, we still want, you know, our proceeds to attach to that. Proceeds of the sale to --

THE COURT: Okay, so how do we -- what vehicle are we going to get the funds into the trust account?

MS. CARUSO: I'm going to file a motion to turnover with this Court. I think this would be two vehicles. One would be an agreed order that we would present to the state court, that their case is going to be dismissed and the funds should be transferred.

THE COURT: This is an agreed order out of what?

MS. CARUSO: In the state court.

THE COURT: Right, but --

MS. CARUSO: I think if the state court's case is going to be dismissed, then they need to know what they should do with these funds. Perhaps what I need to do is file a motion to turnover the funds with this court.

THE COURT: I suppose. To the clerk you mean, to the Hamilton County clerk, I suppose.

MS. CARUSO: We did this in the Gibson Eastern case, but it was actually an agreed order that was presented to the clerk.

THE COURT: Who's going to agree to that?

MS. CARUSO: CitiMortgage, the Roudebushes, the trustee and I believe those are all the parties in the state court case.

THE COURT: But I mean soon. You can do that, you can make that agreement?

MS. CARUSO: With Citi's cooperation --

THE COURT: No, Mr. Yunghans.

MR. YUNGHANS: I believe I can. I mean, certainly that's what I'm going to recommend to my client to accept. I just -- that's the problem is, there's nobody else working on the foreclosure case and it seems like they haven't you know -- they're still thinking there's some sort of lien on the property.

THE COURT: Yes. That's too bad we don't have Feiwell & Hannoy here and, it's too bad we don't have Mr. O'Farrell here. I don't know if Kate told you, but I mean, in looking at this I had Kate call them to invite them, to see if they wanted to be here to try to -- because it looked like there were a lot of questions and, perhaps, they could clear things up. And apparently, obviously, they're not here. So they chose not to be.

MS. CARUSO: We weren't aware at that time that he had filed.

THE COURT: Yes, I had no idea about Mr. O'Farrell's bankruptcy.

UNIDENTIFIED FEMALE SPEAKER: I would indicate I talked to Mr. O'Farrell, or I traded voicemails with Tom and talked with Heather (indiscernible) Mr. McClure and none of them had suggested they were in bankruptcy.

MS. CARUSO: Oh. Well, now that was filed October. Yeah, it's been pending for about -- so, okay. I guess --

MS. ORTMAN: I suppose what I would ask the Court --

THE COURT: On the Roudebushes' relief from stay, you can agree on an order granting that with the provision that at least between the Roudebushes and you, that that money be placed in escrow.

14

MS. CARUSO: Yes.

THE COURT: Right?

MS. ORTMAN: Yes.

THE COURT: So they can proceed, then, with whatever they want. They'll have relief from stay from here.

MS. CARUSO: And they could proceed with relief for the purposes of getting the foreclosure case dismissed.

THE COURT: Okay.

MS. CARUSO: And not proceeding against the funds.

THE COURT: Then you want to present another agreed -- I shouldn't be calling it an agreed order, I guess, agreed entry with CitiMortgage?

MS. CARUSO: I would like to do that and, perhaps, we would need to do that by -- yeah, I guess we could just do an agreed entry, where we would agree that the funds would be -- and I can look at what we did in the Gibson case and I suppose we could have a conversation with the clerk as to what they're going to require in the order to transfer the funds. Yes, I would like to --

THE COURT: Yes. I mean if you can get an agreed entry with CitiMortgage, I wouldn't see why you can't agree for the clerk to transfer and if I --

MS. ORTMAN: They may need something from this court directing --

THE COURT: Well, if I order that -- well, if I approve it and it becomes the order, I assume the clerk will turn it over.

MS. CARUSO: I would assume so.

MS. ORTMAN: We would tender this court's order along with the motion and the funds would be released.

THE COURT: Okay. So that takes care of those two things. And then we have a motion to clarify. I'm not sure --

MS. CARUSO: That's Ms. Ortman.

THE COURT: Yes. That's -- I can't clarify -- I can't issue an order in this case.

MS. ORTMAN: All right. If you would reset, then,18 for 30 days and to the extent we can get an agreed entry that would resolve that and if not, we'll address it in status in 30 20 days?

THE COURT: That's fine. I think -- and then -- in some ways it's too bad that the other bankruptcy is in another court.

UNIDENTIFIED ATTORNEY: And I think it could transfer

THE COURT: I suppose if somebody makes that request I doubt very much if Judge Moberly would care. So I'll do whatever you want in that regard. It might be -- administratively it might be simpler if it was, you know, because we could set things at the same time, if need be. And it sounds like, to me, it will be there.

MS. ORTMAN: I assume so.

THE COURT: Okay.

MS. CARUSO: You know, Your Honor, I think I probably will file a motion to turnover, just in the event this doesn't progress.

THE COURT: That's fine.

MS. CARUSO: Okay.

THE COURT: Okay. So how much time on the agreed entries and the two relief from stays?

* * * * *

THE COURT: Okay. So the agreed entries on the two motions for relief from stay is within 21 days and then –

UNIDENTIFIED ATTORNEY: That's January 23rd –

* * * * *

THE COURT: The 23rd at 1:30? I'll reset the motion, right now, just the one motion, motion to clarify and then if somebody -- you're probably going to be filing a motion for turnover.

MS. CARUSO: Yes, Your Honor.

THE COURT: And somebody may be filing a motion to transfer the O'Farrell case.

16

MS. HINSHAW: Your Honor, for the U.S. Trustee, I've never been involved in that kind of motion before and more than happy to take a stab at doing it. I mean, usually, it kind of happens in the context of substantive consolidation or administrative consolidation. We don't really -- I don't think you can consolidate a 7 and an 11. It's just transferred from one court to another.

THE COURT: No, I'm not talking about -- I'm talking about -- right. So that we could set things at the same time because I think we're going to have common issues. I think if you just -- somebody just files it and said for ease of administration of the cases.

MS. CARUSO: Okay, because they're related cases.

THE COURT: You know, there are related issue and, perhaps, related parties. And so, for ease of administration -- it won't take much.

MS. HINSHAW: I am hearing you, Your Honor. Thank you.

UNIDENTIFIED ATTORNEY: Does Judge Moberly care about that?

THE COURT: I don't think she'll be too broken up.

MS. HINSHAW: Kidding. Okay. So January 23rd at 1:30, motion to clarify.

THE COURT: Okay. So what's the date again?

COURT CLERK: January 23rd, at 1:30 p.m.

THE COURT: Okay. And no further notice, okay. No further notice on that and then we may be getting two more motions fairly soon.

MS. CARUSO: Right. Yes, but we'll do the motion for turnover quickly.

THE COURT: Okay. Well, before you go, let me make I sure I don't have any other questions. I don't -- what -- and maybe nobody can answer that, when the Knightons' case got dismissed and there was money sitting in the account, they didn't try to get that money?

MS. ORTMAN: I don't think anyone did. Yes, I have the same question. I was kind of surprised that CitiMortgage wouldn't try to go after the proceeds.

THE COURT: Well, not only CitiMortgage but weren't the Knightons owed some money, 30,000?

MS. CARUSO: The Knightons called Mr. O'Farrell -- this is at least their testimony at the 341 and I have not questioned them other than the 341. They have indicated they have contacted him on numerous occasions for the past four years and he kept deflecting, giving them the runaround and

17

finally they went and saw Mr. Hauber (phonetic). But I think their bankruptcy situation didn't improve because none of their debts were discharged. The 11 was dismissed, it just got worse. They tried to get the money for about three or four years.

THE COURT: Well, how did the actual closing of this take place? Anybody know?

MS. ORTMAN: Yes, Your Honor. The order was presented to the title insurance company, the purchasers delivered their proceeds, the check from the title insurance company was issued jointly to the Knightons and the O'Farrell trust account and the deed was executed and recorded. And my folks moved in. Didn't know anything --

THE COURT: When did they first learn of the problem?

MS. ORTMAN: After CitiMortgage –

THE COURT: Sued them?

MS. ORTMAN: -- received the summary judgment -- no, they didn't sue them. They never named them in the foreclosure.

THE COURT: Oh, that's right, they only sued the Knightons.

MS. ORTMAN: They knew only when the sheriff delivered the notice of sale plastered to their front door.

THE COURT: That seems pretty odd, too, doesn't it?

MS. CARUSO: Yep.

THE COURT: Well, okay. I guess that's all for now.

### The January 23, 2013 Hearing

Consistent with the preceding, the Court reset the Clarification Motion for January 23, 2013.

On December 27, 2012, Citi withdrew its Chapter 7 Stay Motion. On January 2, 2013, Citi moved to reopen the Knighton Chapter 11. On January 8th, it also moved for relief from the April 30, 2009 order dismissing the Knighton Chapter 11. On January 9th, Citi asked for an emergency hearing to determine the status of the Sale Proceeds. On January 9th, the Court issued separate orders granting

18

all three motions, along with a notice setting the last of the motions for a hearing to be held on January 23, 2013.

Also on January 9th, the Firm–purportedly on behalf of the Knightons–objected to Citi's request that the case be reopened and the dismissal order be set aside. In the Objection, the Firm argued that it was improper for the Knightons to maintain two bankruptcy estates at one time. The Firm also argued that Citi was attempting to amend the Sale Order so as to improperly improve its position vis-à-vis the Knighton Chapter 7. The Firm–again, purportedly on behalf of the Knightons–also moved for relief from the Court's orders reopening the Knighton Chapter 11 case and setting aside the dismissal order (the "Motion to Reconsider").

On January 23, 2013, the Court conducted a hearing, at which Mr. McClure, Ms. Caruso, Ms. Ortman, Ms. Hinshaw, and Randall K. Eyster for Citi appeared. The transcript for the hearing is too lengthy to set forth in full. However, the initial dialogue between and among counsel and the Court provides some sense of the parties' respective positions

THE COURT:  Now would you state your appearances for the record, please?

* * * * *

MR. McCLURE: Alfred E. McClure on behalf of the Knightons.

THE COURT: I'm sorry, for?

MR. McCLURE: Knightons.

THE COURT: I'm sorry?

MR. McCLURE: Knightons.

THE COURT: For the Knightons. Okay.

MS. CARUSO: For the Knightons?

THE COURT: Let me take [Case No.] 12-7266 first. Clean up --

MS. CARUSO: Your Honor, I have a -- I don't want to interrupt you, but I don't understand how counsel can represent the Knightons. They're in a bankruptcy --

THE COURT: Well --

MS. CARUSO: -- proceeding.

MR. McCLURE: That's --

THE COURT: I'll get into that.

MS. CARUSO: Okay.

THE COURT: Let me take up 7266 first. We have the -- there was a relief from stay in that filed by CitiMortgage and that has since been withdrawn. And then we had a relief from stay filed by the debtors, I believe. And on that it -- my understanding, there was going to be an agreed entry filed within a certain time period, but I haven't seen anything.

MS. T. ORTMAN: There hasn't been one filed, Your Honor. We attended the 341 hearing and we're awaiting some results of that. The State Court action was delayed. The hearing reset until the 25th of February hoping that we could get a ruling to resolve the problem on the recent motion and on the opening of the election. We have not communicated further.

THE COURT: Okay. I think there was one other matter set -- it was the motion we reset today. It was that motion asking for a clarification of the order in the '07 case. Okay. So, before we -- I think we talked about that. I'm not sure that -- I'm not sure there is much I can do to clarify the order was made in the '07 case and I guess there was some representations made at that time that the CitiMortgage was going to be filing a motion in that case to reopen, which is what happened. So we probably should move onto that case. And I guess before we take up the emergency motion, I guess I need to do -- to address the motion to reconsider. Mr. McClure, your motion.

MR. McCLURE: Well, Your Honor, I was hoping it came pretty quickly after the motions were -- it's generally understood and the Seventh Circuit -- simply cannot have two of these at the same time. Now, they make an exception for a Chapter 20, but that's not what's happened here. What's happening here is we have an open, existing Chapter 7 that was filed after this '07 case. The '07 case was asked to be open ostensibly to modify the dismissal and the 2007 order that was entered approving the sale of the property. Both -- all of that was noticed properly and not appealable a long time ago. There is nothing that has happened here that cannot be handled in either the State Court action or in the existing Chapter 7. In fact, we -- the trustee in the existing Chapter 7 has apparently at least filed a notice of possible assets relating to a portion of the fund that was held in the [segregated] account for the debtor pursuant to the order that was entered in 2007.

THE COURT: Okay. I --

MR. McCLURE: In --

THE COURT: I've got a couple of questions. You do represent that debtors in this case?

MR. McCLURE: Well, here's the problem. We represent the debtors in the 2007 case.

THE COURT: You represent --

MR. McCLURE: We do not represent in them in the 2012 case.

THE COURT: No. I didn't ask you that. Do you represent the debtors in this case now?

MR. McCLURE: I don't think so.

THE COURT: Then why did you file this motion --

MR. McCLURE: Because there's --

THE COURT: -- on behalf of the debtors?

MR. McCLURE: Because there's nobody in the notice.  The debtors' address was incorrect. And there was nobody in the notice that could answer for the debtors.  We had an obligation to the debtors --

THE COURT: Do the debtors know you filed this motion?

MR. McCLURE: We have had no contact with the debtors.

THE COURT: So you filed a motion on behalf of the debtors anyway?

MR. McCLURE: We had a responsibility, in my judgment, to the debtors to take some action, notwithstanding that because we're the only ones who knew about it.

THE COURT: Yes, but you're representing to the Court that you represent the debtors.

MR. McCLURE: I -- I'm representing to the Court that I have filed the motion because I have not been excused from --

THE COURT: No, you're --

MR. McCLURE: -- representing the --

THE COURT: No, you're not.

MR. McCLURE: -- debtor in this case.

THE COURT: No, you're not. You have said in the motion, the debtors, Mary Elizabeth Knighton and Scott Keith Knighton by counsel.

MR. McCLURE: I am still counsel in that case.

THE COURT: So you do represent them and they're aware of it?

MR. McCLURE: They have not discharged us from the 2007 case. But we haven't had contact with them.

THE COURT: Okay. That -- that's my first --

MR. McCLURE: I mean, it's a problem.

THE COURT: That's my first question. The second question is, what has happened to the funds that were escrowed?

MR. McCLURE: The funds that --

THE COURT: Pursuant to the Court's order of December of 2008.

MR. McCLURE: The funds had been -- part of the funds were sent to the Court -- the State Court.

THE COURT: Which court?

MR. McCLURE: The Hamilton County Superior Court 1.  That's where $95,000 was sent.

THE COURT: And the rest?

MR. McCLURE: The remainder of the funds -- not all the remainder of the funds -- a small part of the funds were used to pay the United States Trustee's fee that was left over when the case was closed.

THE COURT: How much was that?
MR. McCLURE: I don't know offhand but we certainly are glad to make an accounting of it. The -- it was like 2,000. The remainder, we used to pay an attorneys lien which we applied to those funds.

THE COURT: Under what authority?

22

MR. McCLURE: Under the authority of our -- the authority of the attorney liens statutes and the attorney lien common law of the State of Indiana.

THE COURT: So you paid your -- you paid those funds out of your trust account into your operating account?

MR. McCLURE: That is correct.

THE COURT: And that was how much?

MR. McCLURE: Whatever the difference is between the -- about 50,000, I think.

THE COURT: About $50,000?

MR. McCLURE: Yeah. Again, we're --

THE COURT: And those are the --

MR. McCLURE: -- perfectly willing to --

THE COURT: -- it was attorney fees for what?

MR. McCLURE: For the representation in the original bankruptcy, 20,000 of which had already been approved by the Court and during the -- and the representation in the State Court action. The State Court action went on for two years after the -- after this case was -- after the Bankruptcy Court lost jurisdiction of this case.

THE COURT: So these were fees earned in the -- not in the bankruptcy but in the State Court action --

MR. McCLURE: In both.

THE COURT: -- post --

MR. McCLURE: In both.

THE COURT: Well, how -- but you -- you applied for and got paid --

MR. McCLURE: No. We didn't get paid.

THE COURT: No, you get -- you applied for $20,000 and you wound up --

MR. McCLURE: And was approved. But not --

23

THE COURT: -- getting paid –

MR. McCLURE: -- paid.

THE COURT: So the rest -- how much was it -- how much of the 50,000 was for the bankruptcy proceedings?

MR. McCLURE: Probably 30 to 35,000 of it in total.

THE COURT: And when did you get approval from the Bankruptcy Court to have those fees paid?

MR. McCLURE: There was no way to get approval. The Bankruptcy Court had lost jurisdiction.

THE COURT: So you thought you had the authority to take it on your own then?

MR. McCLURE: We had -- we believe --

THE COURT: You didn't think you should try to reopen the bankruptcy to get that authority to take it out of your trust fund?

MR. McCLURE: We had -- the bankruptcy dismissal order was final. Not appealable. It is our judgment and it remains our judgment that we were not -- we could not reopen the bankruptcy case. I don't think -- and I think it remains the same, that nobody can reopen this bankruptcy case and nobody can alter this case.

THE COURT: Okay. Well, it's been reopened.

MR. McCLURE: I understand that.

THE COURT: So obviously somebody can. The question is whether I reconsider the reopening of that. So your position is that the debtors, who you have not had any contact with, are attempting to pursue some kind of relief in both the Chapter 7 case and this previous Chapter 11 case, is that it?

MR. McCLURE: That is correct. But the debtors aren't -- the debtor --

THE COURT: And the debtors --

MR. McCLURE: The debtors did not reopen the case so they're not pursuing relief in the Chapter 11 case. They've already received relief and a discharge in the Chapter 7 case.

THE COURT: Okay. Let's see -- anybody want to address the motion for -- motion to reconsider?

MR. EYSTER: I would like to, Your Honor. The motion cites In Re: Sidebottom. An analysis of

24

Sidebottom is just not applicable in this case. That -- the analysis in Sidebottom references that the debtor actively opening two cases and it talks -- it's about the Chapter 20 situation. Whether they be simultaneous, one is not yet closed and debtor files a second one, which is what the debtor in Sidebottom did or whether they are one after the other. It has nothing to do with whether or not, for purposes of defining the rights that were delineated during the case and upon which parties relied, being further adjudicated. Additionally, the debtor relies on Espinosa and that had -- that was all about the student loan discharge and in that case it was a confirmed plan that provided the student loan with discharge. U.S.A. Funds appealed. It related to whether or not that final confirmation order could be disturbed. The -- again, not on point but the final order in this -- in the '07 case, begs further action. It specifically says, funds are not to be distributed except by further order of this Court. So there's a held, proceeds are tendered, there was never a -- 6004 report of sale, there's cash collateral out there with a valid lien on it that the Court has never given an order on how it was to be administered. We think it's perfectly valid to deny the debtor -- the debtors' motion to reconsider opening this.

THE COURT: Ms. Hinshaw.

MS. HINSHAW: Your Honor, quickly if I may, three things. Jeannette Hinshaw on behalf of the United States Trustee. First, I'm totally in agreement with Mr. Eyster on the question of whether the Chapter 11 case can be reopened or if it was correctly reopened. Obviously, it can be reopened. I think the Sidebottom case is entirely inapplicable on the facts. Perhaps more importantly, the policy behind the Sidebottom case where you don't want debtors running around in two different forums some -- somehow trying to bootstrap them into -- bootstrap themselves into some remedy they don't deserve. That's a policy way over here. That policy has nothing to do with reopening the 2007 Chapter 11 case. And from my position -- or in my mind, that -- the Sidebottom could just not be more inapplicable. Secondly, Mr. McClure said that at the time the 30 or some thousand attorney fees were taken from the trust account to the McClure O'Farrell operating account. The Chapter 11 case could not be reopened. And I see no reason why it could not have been reopened. Chapter 11 cases get dismissed or closed. It's not that unusual for whatever reason because two parties over here agreed on something and then all of a sudden somebody figures out that Party's 3 and 4 have something unresolved, so it gets reopened and then reclosed. I know of no reason in law, statute or case law why the case could not have been reopened and the debtors back then could not have gotten an order authorizing the payment of fees and in fact because Your Honor specifically had ordered that money shall be held in a segregated account until further order of the Court, I think there was an absolute duty back in the 2007 Chapter 11 case for there to be a reopening before any fees got paid to the law firm. Thirdly, and parenthetically, I believe current counsel for the Knightons is here in court. Mr. McClure stated at the beginning of this that he represents the Knightons at least within the parameters of the Chapter 11 case that has currently been reopened but if Your Honor had any questions for current counsel for the Knightons in the Chapter 7 case, I believe he's available. Thank you, sir.

MR. EYSTER: And Your Honor, I would add something else. I -- so we kind of discussed the legal reasons for why the debtors' motion should be denied. There's also a very practical reason. I'm not

25

sure why the debtors would oppose the motion for accounting. The debtors actually filed a letter in the State Court action in April of last year, specifically supporting that an accounting being held. And Mr. Hauber (phonetic) represents the Knightons in their pending Chapter 7 and he has indicated he'd be willing to elaborate to the Court pursuant to a conversation he and I have had that the Knightons do not oppose an accounting.  So I -- I'm -- from a practical perspective, it also 25 makes no sense that the debtor would want to ask the Court to reconsider its order reopening the case.

THE COURT: Wouldn't he have got --

MR. EYSTER: Your Honor, they didn't --

THE COURT: Wait. Before you -- when they got this -- there's a motion to dismiss by the U.S. Trustee.  And of course, this -- we're now talking, what -- three, four years ago. I think I -- I think it was fees weren't being paid and there was something about insurance.

MS. HINSHAW: Yes.

THE COURT: What happened then either with the 11 trustee -- the U.S. -- well, the U.S. Trustee or even CitiMortgage when we had this order that was still up in the air, so-to-speak? You know, in other words, the funds were to be paid into the attorney's -- the debtors' attorneys trust account and not to be distributed without further order of the Court?

MS. HINSHAW: Your Honor, are you directing --

THE COURT: Well, either one. Trustee or CitiMortgage, I guess.

MS. HINSHAW: All right. The Office of the U.S. Trustee did not know that any attorneys fees were being put anywhere. I have to admit that one of the wrinkles here is, I believe the order said the funds are to be put in a segregated account but it didn't say a segregated account for the debtors' attorney's office. I think that's the understanding of everybody in the courtroom at the time. I think the underlying motion would certainly support that but it's possible --

THE COURT: Yes. I think the -- let me look real quick.

MS. HINSHAW: I certainly could be wrong, Your Honor.

THE COURT: Well, I think the transcript -- because there was a transcript that was prepared at -- I think it was CitiMortgage's counsel requested it --

MR. EYSTER: That's correct, Your Honor.

THE COURT: -- at some point and that was filed and I thought there was some wording in there --

Mr. O'Farrell was actually counsel for the debtor at the time. Now, it -- it does say what we'd like permission to do is -- this is Mr. O'Farrell talking -- is to go ahead and close, Your Honor, and put that money in a separate account -- a segregated account so we can then distribute later.  At any rate, Mr. --

MS. HINSHAW: It strikes me as very odd that Mr. O'Farrell's counsel is now arguing against Mr. O'Farrell's own words and it strikes me as very odd that Mr. McClure -- again, Mr. McClure needs to be a zealous advocate and needs to be careful of respecting the rights of whomever his client is, but underlying all of this is a tug and pull.  The Knightons may, may arguably now be adverse to Mr. O'Farrell and the firm McClure and O'Farrell. So it's tenuous at best for Mr. McClure to state that he represents the debtors although he may just be doing that for the sake of formalities but for him to advance a substantive argument that the case should not be reopened and to purport that that argument is coming from -- of the Knightons is, I think, tenuous at best.  But to the extent I didn't answer your direct question, I apologize and that may be for somebody else to answer.

THE COURT: Yes.

MR. McCLURE: I'd like to answer it.

THE COURT: Okay, sir.

MR. McCLURE: Everybody knew when they filed a motion -- CitiMortgage filed a motion to lift the stay and abandon the property after the sale, Mr. O'Farrell filed a response that said, that the property had been sold. They nonetheless continued with their -- continued with the motion which was at the same time that the trustee had moved to dismiss the case. Both parties were aware that this sale had taken place. It nonetheless got to a hearing and if my memory is right, we walked into the hearing -- because I believe I came, and boom, the case was dismissed. Neither CitiMortgage nor the trustee was paying sufficient attention to what had happened.  And had they, all they needed to say to the Court was, Your Honor, this should be converted to a Chapter 7 because there's undistributed funds up there. And we would not have objected.  Okay. We had a responsibility to our client and frankly the Knightons were probably better off dismissed then converted to a 7. So our lips are somewhat closed in an issue like that.  Nonetheless, Mr. O'Farrell spent two -- two, almost three years, trying to negotiate with CitiMortgage. Holding that money, trying to come to an arrangement to pay them, at the same time -- and I presume the Knightons are releasing me from my confidentiality?

MS. CARUSO: Um, that would be held by me.

MR. McCLURE: Okay. Are my -- am I released?

MS. CARUSO: I'm not going to give you a blanket release but I will definitely waive any privilege for you to explain to the Court what happened to the money, okay.

MR. McCLURE: Well, then I can't explain to the Court why what happened to the money, but I'm perfectly happy -- and we -- if you noticed, this motion to account has always been that somebody give us a court order -- give us some cover so we can account this without having to worry about whether or not we're violating attorney/client confidentiality. Okay. And that is the basis. We've never objected to telling what happened. I feel very comfortable about how this position developed, what the status of that -- funds were and once this Court lost jurisdiction in this case and certainly CitiMortgage thought the Court lost jurisdiction, because they went back to State Court. They obtained a judgment. They obtained a judgment against the poor Roudenbushes which then had to be set aside. And here, at the same time they knew the property had been sold because they got the notice in this court. Okay. We stepped in and spent time holding that money, trying to solve this problem. We have correspondence with CitiMortgage discussing the fact that it doesn't appear the case can be reopened. We can't do anything about the dismissal. It's res judicata. Nobody appealed it. We're stuck with it. We have a dismissed case, what do we do? Okay. On the one hand, we have CitiMortgage being in intransigent about their numbers on the other hand we had the -- we had our client insisting that we not provide them with certain kinds of information and save time trying do this. We tried to take it to -- Mr. O'Farrell tried to take it mediation. He scheduled the mediation but CitiMortgage decided they weren't going to send a representative with any authority. This is what happened through the whole case. And this is with moving -- still trying for us to get some authority to provide all the information. At the same time -- then the -- Mr. O'Farrell even talked to -- at some point, talked to an attorney in Florida because the Knightons had moved to Florida -- at least Scott Knighton had been there for years. Trying to -- that they're going to file bankruptcy in Florida, discuss what the status was, discussed the fact that there was probably no lien on the funds in our hand at this point at all. And at least if he filed bankruptcy in Florida, the trustee could claim -- make a claim on that money and sort it out. Okay. That didn't happen. Finally, when we couldn't get anywhere with the Knightons, we took the action of applying our attorney's lien to the funds that would have been owed to us --

THE COURT: What do --

MR. McCLURE: -- and sent --

THE COURT: -- you mean when you say you couldn't get anywhere with the Knightons?

MR. McCLURE: I -- we could not get the Knightons to agree to anything. That's the same reason the case was dismissed in the first place. Scott Knighton would not agree to a payment to his ex-wife for his domestic support obligation, which is required. He wouldn't sign the plan that was supposed to be prepared the day before that hearing to be filed. And this is what we went through with the clients. At the same time, we're trying to get solved with CitiMortgage and CitiMortgage keeps raising the ante. CitiMortgage in fact offered at one point the entire amount of their at one point the entire amount of their claim and they rejected it. At some point, we threw our hands in the air and we sent the remainder of the money to the court. And if somebody wants to sue McClure and O'Farrell over whether or not our lien is superior in -- over CitiMortgage's lien, bring it on. Because I don't think CitiMortgage has a lien on this money even now. I think the money that's in that

28

account actually belongs to the trustee in bankruptcy, but that trustee has made no attempt to get it because the lien died, and then the case was dismissed. And we've done an awful lot of work trying to figure out what happened here, and that's what happened. And we believe firmly in our position and I'm prepared to fight it as far as it goes because I believe that what we've done is proper in the case. And what we have is a lot of people sleeping at the wheel. This case was brought to this court on motion to dismiss without anybody looking at the file. In my judgment -- practice on the part of the attorneys for CitiMortgage, sloppiness on the part of the Office of the U.S. Trustee and boom, that's where we were. And believe me, bet your money that we had wished we hadn't had it in the first place, but it wasn't our money. It was always theirs. That money was not given to the attorneys, that money was given to the debtor. And under 349, once this case was dismissed, that money reverted to the debtor. And when that money was sold, it was sold free and clear of all liens. We had a -- we had money in that account with no liens on it and we worked our butt off to make some protection for everybody on it and ultimately it didn't work.

THE COURT: Anybody else on the motion to reconsider?

MR. EYSTER: Judge, I'd like to just clarify some of the time lines and the altruism that McClure and O'Farrell engaged in, in inheriting this money that they felt so burdened by it that they took $55,000 of it and applied it to their own fees. The hearing on the motion to sell was held on -- did occur -- that hearing was held on November 20th. And it's unfortunate that the transcript is not very clear. I've actually listened to the audio and you just -- you just can't hear very well what's going on. But, at any rate, the hearing was held on November the 20th. An agreement was struck in principle. There was to be an order tendered after circulation to counsel for Citi and counsel for the U.S. Trustee. We followed up with Mr. O'Farrell on December 5 of 2008. Got no response. That order had actually been entered on December 3rd without being circulated to our office and potentially without being circulated to the Office of the U.S. Trustee. We contacted Mr. O'Farrell again in February regarding no payments and to find out what was going on and we -- no response. Keep in mind no report of sale was ever filed regarding this money that they wanted so badly to make sure it got where it needed to go. We then filed a motion for relief because we're not getting any payments, there's no report of sale, we're at -- we're receiving no communication. The debtor objected on March 2 the 25th of 2009 and in that objection states the property has been sold. That's the first time that we know that that property has now been sold. Then, if you look at the docket, the motion was filed on February 27th. There's an -- on March 3 an official court notice setting the hearing, the objection filed on March 25, then the debtor files a motion to continue the hearing on the motion for relief, order granting. Debtor files a motion to continue. The continued hearing on the motion for relief. Then the motion to dissent -- dismiss the case was filed. So what the debtor then -- what Mr. McClure and O'Farrell did while they were diligently trying to get this money where it was supposed to go, was continue to continue the hearing out, then no object to the U.S. Trustee's motion to dismiss the case despite the obligation to zealously advocate for the Knightons' position. They don't object when the case gets dismissed. Then -- that's what happened between the time of the hearing on the motion to sell and the dismissal of the case. We tried to get back in front of Court. The hearing got continued three times on debtors' motion.

29

THE COURT: And that -- when it got dismissed, did that not surprise CitiMortgage?

MR. EYSTER: I believe it did and I believe at that point we just -- I think the decision was made to pursue it in State Court and force the funds to be presented there.

THE COURT: And what was -- was there a new action filed in State Court?

MR. EYSTER: No. There was one pending at the time of the bankruptcy.

THE COURT: Okay.

MS. T. ORTMAN: Your Honor, if I may?

THE COURT: Was there a -- did it end up -- did there end up being a State Court order ordering the funds to be paid or is it just paid in voluntarily?

MS. T. ORTMAN: There is an order.

THE COURT: What was ordered to be paid into it?

MS. T. ORTMAN: The remaining proceeds that McClure and O'Farrell held from the prior sale.

THE COURT: Didn't have an amount?

MS. T. ORTMAN: It does not.

THE COURT: Okay. Anybody else on the motion to reconsider?

MS. T. ORTMAN: Yes, Your Honor. In addition to counsel's recitation of the chronology here, there are couple more, in fact there are three pleadings in the Chapter 11 which identify specifically the sale of the real estate. The application to sell that was filed November the 7th includes the purchase agreement to the Roudenbushes and a sum certain amount and date for the sale to be completed. And the order granting was filed and entered on December the 3rd. The application for compensation and reimbursement to McClure and O'Farrell identifies the real estate as being sold. And on 2/27 Citi files motion for relief of the stay and to abandon the real estate but it knows from three prior entries that that real estate has been sold. And again, Knightons' objection identifies -- it was filed 3/25, that the property has already been sold. There's no reason for someone to say they didn't know. And four years later, Citi didn't ask for the money. I certainly am not in a position to say that Citi isn't entitled 13 to the money, but why didn't they ask for it back then? And why now are we trying to find that money and the missing $55,000, which we'd all like to know where it is. We had plenty of time and plenty of opportunity to defend -- to define that, identify the money, collect the money and pay over the lien that attached to the proceeds. The --

THE COURT: What was the two, three, four-year fight over the money? Was there -- was it not -- was it over the amount that was owed? Was -- whether it was owed? Whether CitiMortgage even had a lien on the property? What was it?

MR. McCLURE: It was our position that Citi did not have a lien on the property but we also felt that Citi – CitiMortgage had -- CitiMortgage was clearly going to get a judgment against the Knightons. You had -- the money was clearly owed. Okay. We did not believe at that time that CitiMortgage either had mortgage on the property, because that property had been sold pursuant to the Court (indiscernible), nor do we believe that they had a lien on the cash. Okay. The discussions were -- and --

THE COURT: You say -- you saying they'd been sold free and clear?

MR. McCLURE: Yes. The property was sold free and clear of all liens. And that's your order.

MS. HINSHAW: And --

MR. McCLURE: And --

MS. HINSHAW: -- did the debtor think that it was with liens to attach to proceeds or --

MR. McCLURE: No.

MS. HINSHAW: -- it was totally free and clear?

MR. McCLURE: They did -- the lien -- in my judgment the lien clearly did not attach to proceeds. Now I think that may --

MR. EYSTER: Despite the motion saying liens to attach --

MR. McCLURE: No --

MS. HINSHAW: It was debtors' counsel who provided the order to the Court.

MR. McCLURE: And the --

MS. HINSHAW: Failed to say free and clear. They don't just say free and clear with liens to attach to proceeds and now same debtors' counsel is -- they're trying to argue itself into an advantageous position based on prior failures.

MR. McCLURE: No. What we're -- what it comes out to is the order says what the order says and the order, based on what I looked at, matches the prayer in the motion. Now, what really happened, with all due respect, you didn't pay attention. The trustee's office didn't pay attention --

31

MS. HINSHAW: Does the U.S. Trustee's --

MR. McCLURE: -- and --

MS. HINSHAW: -- office --

MR. McCLURE: -- they didn't pay attention.

MS. HINSHAW: -- have a duty to represent the debtor in the Chapter --

MR. McCLURE: I think if you --

MS. HINSHAW: -- 11 case?

MR. McCLURE: I think that the U.S. Trustee's office -- if they're going to file a motion to dismiss, has a duty to figure out what's going on in the case.

MS. HINSHAW: I thought that was the job of debtors' attorney.

The hearing continued from there in much the same vein. The Court ultimately denied the Motion to Reconsider. The Court also indicated that it intended to order an accounting of the Sale Proceeds and turnover of the Sale Proceeds from both the Firm and the state court. There was further discussion about whether Citi was willing to voluntarily release its foreclosure judgment (it was not so willing) and what actions, if any, the Roudebushes anticipated taking in the state court action in an effort to establish their clear title to the Property. From the discussion had on January 23rd, it was abundantly clear that there were numerous unresolved and contentious issues left to be litigated and adjudicated.

Following the January 23rd hearing, the Court issued two orders, both on January 28, 2013: First, the Court issued an order directing the Hamilton Superior Court and the Firm to turnover the Sale Proceeds to the Clerk of the United States Bankruptcy Court (the "Turnover Order"). More specifically, the Hamilton County Clerk was directed to turnover the $95,294.62 that had been

previously deposited by the Firm as part of Citi's foreclosure action against the Knightons. The Firm, in turn, was directed to turnover to the Clerk the balance of the Sale Proceeds, in the amount of $52,537.06. The Court also ordered the Firm to provide an "accounting" of the Sale Proceeds from the date they were paid to the firm to the date(s) they were distributed. Such accounting was to include "bank statements, deposit and/or withdrawal slips, and copies of any and all cancelled checks that were written against the segregated account in which the Proceeds were placed." *See Order (1) Directing Turnover of Certain Funds to the Clerk of the United States Bankruptcy Court; (2) Directing McClure & O'Farrell, P.C. to Provide and Accounting of Such Funds; and (3) Directing Clerk to Accept Deposit of Funds* at *2. The Court indicated that failure to comply with Turnover Order by February 15, 2013, could "result in a finding of contempt and/or sanctions." *Id.*

Second, the Court issued an Order Clarifying Court's Order of December 3, 2008 (the "Clarification Order"). That Order stated in part:

> At the January 23rd hearing, the Court learned even more disturbing information, including representations from Mr. McClure that the Firm had applied approximately $51,000.00 of the Proceeds to Debtors' outstanding legal fees by virtue of an "attorney's lien." It also became clear at the hearing that both Citi and the Firm have long been confused as to the import of the Sale Order and have operated on several arguably incorrect assumptions, e.g., that the Property was sold subject to Citi's mortgage and that Citi's lien did not attach to the Proceeds.

> With that in mind, the Court finds it absolutely imperative to clarify the Sale Order post-haste. While the terms of the sale could have been made more explicit in the Sale Order, the Sale Order is nevertheless unambiguous. The Order *clearly* granted the Sale Motion and the Sale Motion, in turn, *clearly* sought permission to sell the Property to the Buyers free and clear of Citi's mortgage, with Citi's lien to attach to the Proceeds. The Order also *clearly* provided that the Proceeds were not to be distributed *until further order of the Court*. The Court, at least at this stage in the proceeding, is unwilling to interpret the Sale Order in any other way.

> The Court is dumbfounded as to why Citi and the Firm failed to understand the import and meaning of the Sale Order. But even assuming such confusion was

33

warranted, the Court is also dumbfounded as to why neither of them timely sought to resolve that confusion with this Court, either before the Chapter 11 case was dismissed or thereafter. Citi made no effort to forestall dismissal of the case and sought no relief when the case was dismissed. Mr. McClure's insistence that the dismissal order was "res judicata" and not susceptible to being set aside is simply absurd. This Court routinely sets aside dismissal orders, and every order and judgment of this Court is implicitly subject to the relief provided by Federal Rule of Bankruptcy Procedure 9024. . . .

Obviously, many factual and legal issues remain to be adjudicated, and the Court fully intends to provide the parties with a full and fair opportunity to address those issues. Certainly, the Court will take into consideration the parties' respective legal claims to the Proceeds and to any other claim they might make, but the parties are hereby put on notice that the Court will also consider the equities of this situation in making its determinations. With that in mind, the Court emphasizes that based on the representations already made regarding the Citi's and the Firm's course of conduct, it is appalled by the manner in which both have proceeded in this case and in the state court foreclosure action. No compelling reason has yet been offered that explains why what should have been a straightforward asset sale turned into a mess of this magnitude.

*Order Clarifying Court's Order of December 3, 2008* at *5-7 (internal footnotes omitted)(italics in the original).[8]

The Hamilton Superior Court turned over the funds it had on deposit, and the Clerk continues to maintain custody of those funds. While the Firm filed an accounting by the prescribed deadline, it did not remit any funds to the Clerk. The Court then issued an Order to Appear and Show Cause (the "Show Cause Order") that directed an "authorized representative" of the Firm to appear and

---

[8]  The Clarification Order also stated the following:
The Court wants to make clear that certain of the "facts" set forth in this order, especially those concerning the state court foreclosure action, have not yet been determined by way of an evidentiary hearing. Rather, they are based on representations made either in pleadings or in open court by the various parties' counsel. By this Order, the Court is not formally making "findings of fact." The Court reserves adjudication of the facts essential to this case for a later date. Many of the details provided herein for what transpired after dismissal of the Chapter 11 case are given simply to provide some background as to the current posture of this case. That said, none of the parties have yet disputed any of the factual representations made concerning what happened since dismissal of the Chapter 11 case.
*Order Clarifying Court's Order of December 3, 2008* at *4, n.8.

show cause as to why the Firm should not be held in contempt.

## The March 14, 2013 Hearing

The hearing on the Show Cause Order was conducted on March 14, 2013.   At the hearing,
Mr. McClure testified under oath about the accounting the Firm had provided.  From the testimony,
it became clear that the accounting was woefully deficient and that Mr. McClure either did not have
personal knowledge of certain critical aspects of the accounting.  He suggested that Mr. O'Farrell
was likely more familiar with the matters at issue.  It was also clear that he had not, prior to the
hearing, fully reviewed the Knightons' file or the bank records relating to the Sale Proceeds in that
he was unable to offer any or much information on a variety of critical questions, ranging from the
terms of the Knightons' engagement of the Firm; details regarding the Knightons' written
authorization to apply the Sale Proceeds to their fees; the specific authority relied upon by the Firm
to assert an attorney's lien on the Sale Proceeds; the dates on which the Firm withdrew $27,165 from
the Sale Proceeds as payment of the Knightons' legal fees; and whether the funds, when withdrawn
from the Firm's trust account, were moved to the Firm's operating account. The testimony also
indicated that at least one critical page of the accounting was inaccurate.[9]

## The Amended Accounting

Admittedly frustrated that the Firm had provided a deficient accounting and had not sent an
authorized representative to the March 14th hearing who was fully knowledgeable with the issues at
hand, the Court ordered the Firm to produce the following:

> [W]ithin 14 days of this Order, the Firm shall file an amended accounting that fully
> and accurately reflects the deposit and disbursement of the sale proceeds at issue in

---

[9]  At the March 14, 2013 hearing, the Court heard testimony from Mr. McClure that the Firm was
no longer operating and that he and the O'Farrells were now operating as McClure & O'Farrell, LP.

this case. The amended accounting shall be filed under oath and signed by each and every shareholder, officer and board member of the Firm. The amended accounting shall include all bank statements of the Firm's trust account at Community Bank from December, 2008 to the present time. Client names and any other privileged information shall be redacted from the statements. The amended accounting shall also include the Firm's tax returns for the fiscal years 2011 and 2012. The amended accounting shall also include any and all authorizations given by the Debtors to the Firm regarding the payment of the Firm's fees and expenses from December 3, 2008 to the present time. Failure to timely file an amended accounting that fully complies with the above order will result in a finding of contempt and/or sanctions.

*Order Directing McClure and O'Farrell, P.C. to File an Amended Accounting and Setting Continued Hearing On Order to Appear and Show Cause* at *2. The Order set an additional hearing for Wednesday, April 10, 2013, at 9 a.m., at which Mr. McClure and the O'Farrells were ordered to appear. The Court specified that failure to appear would result in the issuance of a body attachment. The Court notes that it did not reiterate its previous order that the Firm turn over the balance of the Sale Proceeds.

The Firm filed an amended accounting on March 29, 2013. However, the hearing originally scheduled for April 10, 2013, has been continued several times and has, to date, not been held. Ms. Caruso had a conflict with the original setting, and Mr. McClure suffered some health problems that necessitated several continuances. Then, on July 17, 2013, the Firm filed the Recusal Motion in this case, to which Ms. Caruso and the Roudebushes filed responses. The O'Farrells have filed an identical motion in their bankruptcy case. The O'Farrells have also filed a complaint in their case, under Adversary Proceeding No. 13-50164, against Ms. Caruso, Mr. Yunghans, Ms. Ortman and the Roudebushes under 11 U.S.C. § 362(k)(1) for allegedly willfully violating the automatic stay (the "Stay Violation Adversary").

36

**The Recusal Motion**

In the Recusal Motion, the Firm argues that the Court should recuse from their case pursuant to 28 U.S.C. 455(a) and (b)(1).  More specifically, the Firm complains of the fact that while the Court attempted to secure the Firm's attendance at the hearing–recognizing that it might have information to share concerning the conduct of the sale in the Knighton Chapter 11 and with the status of the Sale Proceeds–it nevertheless conducted the hearing without anyone from the Firm present and did not provide a meaningful opportunity for the Firm to participate.  The Firm also complains that the Court heard unsworn, "hearsay" testimony from certain of the counsel in attendance at the December 13, 2012 hearing that was designed to be, and was, prejudicial to them.

The Firm further contends that the Court then improperly instructed counsel in attendance at the December 13, 2012 hearing on "how to reopen the Knighton [Chapter 11], how to transfer the O'Farrell Bankruptcy into his Court (even though there was no previous precedent for this type of transfer as stated by Jeannette Hinshaw . . .) and how to practice in the State Court Roudebush foreclosure case."  The Firm also take issue with the fact that the Court asked that the O'Farrells' bankrutpcy case be transferred from the Honorable Robyn L. Moberly.

The Recusal Motion also alleges the following:

Judge Coachys then Ordered McClure & O'Farrell, P.C. . . . without Hearing, Notice, or the ability to be heard, to transfer funds to the United States Bankruptcy Court based solely on hearsay arguments or the ability for the non-parties to respond. Judge Coachys ordered the payment of such funds without determining whether such funds were property of the 2007 bankruptcy estate.

Judge Coachys has Ordered O'Farrell, McClure O'Farrell and McClure to appear for Hearing or a Writ of Body Attachment without the parties [sic] ability to respond to a formal Motion or the non-parties being found in contempt.

Judge Coachys has issued Orders without any of the parties requesting same based

37

solely on the hearsay statement made by the "Attorneys."

*Motion for the Honorable James K. Coachys to Recuse From This Cause Pursuant to 28 U.S.C. §
455(a) and (b)(1)* at *2.

Finally, while the Firm does not specifically cite to or quote 28 U.S.C. § 455(b)(5)(iv), they

argue in the Recusal Motion that the Court must disqualify itself because "Judge Coachys will be

a witness" in the Stay Violation Adversary based on his participation in the allegedly "*ex parte*

conversations" that took place at the December 13th hearing.  *Motion for the Honorable James K.

Coachys to Recuse From This Cause Pursuant to 28 U.S.C. § 455(a) and (b)(1)* at *3.  And while

not alleged at all their Recusal Motion, the Firm also argued at the hearing on the Motion that staff

counsel could also be called as a witness in the Stay Violation Adversary based on the allegation that

staff counsel must have had *ex parte* communications prior to the December 13, 2013 hearing.[10]

## Discussion and Decision

The Court notes that the Firm provided no citation to case law or any other legal authority

in support of their Recusal Motion.  While they have set forth numerous allegations based on the

proceedings described above, they have not specifically framed those allegations with reference to

applicable case law or the standards that govern recusal under 28 U.S.C. § 455.  The Court further

notes that the Firm made no attempt to indicate which of its allegations support recusal under 28

---

[10] As previously indicated, the Recusal Motion in this case is identical to the recusal motion filed by the O'Farrells in their own bankruptcy case.  All of the allegations contained in that motion were repeated, verbatim, in the Recusal Motion filed in the Knighton Chapter 11, even though they seemingly do not have the same relevance in each case.  In particular, it is not clear why the Court would need to recuse from the Knighton Chapter 11 case if it is called as a witness in the Stay Violation Adversary.  Nor it is clear why the transfer of the O'Farrell case is relevant to the Recusal Motion in this case.  In an abundance of caution, the Court addresses all of the arguments raised in the Recusal Motion, even those that seem to have no bearing on the Knighton Chapter 11.

U.S.C. § 455(a) and those that support recusal under § 455(b)(1), notwithstanding the Court's request that they do so at the hearing on the Recusal Motion. Thus, it is up to the Court to divine the Firm's specific arguments as best it can.

## 28 U.S.C. § 455(a)

Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In evaluating whether a judge's impartiality might reasonably be questioned, our inquiry is "from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Cheney v. United States Dist. Court*, 541 U.S. 913, 924, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004)(Scalia, J., in chambers)(citation omitted); *See also Sao Paulo State of the Federative Republic of Brazil v. Am. Tobacco Co.*, 535 U.S. 229, 232-33, 122 S.Ct. 1290, 152 L.Ed.2d 346 (2002); *United States v. Holland*, 519 F.3d 909, 913 (9th Cir.2008); *In re Basciano*, 542 F.3d 950, 956 (2d Cir.2008), cert denied, 555 U.S. 1177, 129 S.Ct. 1401, 173 L.Ed.2d 596 (2009); *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir.2004); *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir.2003). That an unreasonable person, focusing on only one aspect of the story, might perceive a risk of bias is irrelevant. *United States v. Bonds*, 18 F.3d 1327, 1331 (6th Cir.1994). Consequently, where a judge's comments, writings, or rulings are the basis for a recusal request, our analysis assumes that a reasonable person is familiar with the documents at issue, as well as the context in which they came into being. *See White v. NFL*, 585 F.3d 1129, 1139-40 (8th Cir.2009).

In addition to being well-informed about the surrounding facts and circumstances, for purposes of our analysis, a reasonable person is a "thoughtful observer rather than . . . a hypersensitive or unduly suspicious person." *In re Mason*, 916 F.2d 384, 386 (7th Cir.1990), quoted

in *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 988 (7th Cir.2001), and *Hook v. McDade*, 89

F.3d 350, 354 (7th Cir.1996); *accord U.S. v. Holland*, 519 F.3d 909, 913 (9th Cir.2008).  Finally, a

reasonable person is able to appreciate the significance of the facts in light of relevant legal standards

and judicial practice and can discern whether any appearance of impropriety is merely an illusion.

*See Cheney*, 541 U.S. at 924, 124 S.Ct. 1391; *see also In re Mason*, 916 F.2d 384, 387 (7th Cir.1990).

Trivial risks are endemic, and if they were enough to require disqualification we would have a

system of peremptory strikes and judge-shopping, which itself would imperil the perceived ability

of the judicial system to decide cases without regard to persons.  A thoughtful observer understands

that putting disqualification in the hands of a party, whose real fear may be that the judge will apply

rather than disregard the law, could introduce a bias into adjudication.  Thus the search is for a risk

substantially out of the ordinary.  *Mason*, 916 F.2d at 385-86.

Based on the above standard, the Court cannot conclude that a "thoughtful observer" would

reasonably question its impartiality toward The Firm.  Admittedly, it is difficult to discern what a

"thoughtful observer rather than . . . a hypersensitive or unduly suspicious person" might make of

the matters before this Court that relate to the Knightons' and the O'Farrells' respective cases, as the

procedural and factual history is, in a word, complicated.  It is, quite frankly, a most unusual and

unfortunate situation, and the Court holds itself partially to blame for the fact that the Knighton

Chapter 11 case was closed without first resolving the parties' respective rights to the Sale Proceeds.

Much of what has happened since dismissal of that case might have been forestalled if it had.

That said, the Court cannot conclude that recusal is warranted under 28 U.S.C. § 455(a).  The

December 13th discussion regarding the O'Farrell bankruptcy case must be viewed within its larger

context.  The December 13th hearing related, fundamentally, to addressing (1) the Roudebushes

desire for clarity that their purchase of the Property in the Knighton Chapter 11 was free and clear of any liens and encumbrances; and (2) securing those Sale Proceeds that were being held by the Hamilton Superior Court so that they could be administered in some fashion by Ms. Caruso, as the trustee in the Knighton Chapter 7.

The fact that the O'Farrells–principals of the Firm–had filed for bankruptcy–a fact not known to the Court until the hearing–was relevant to this second issue, as the Firm had previously been ordered to hold the Sale Proceeds in a segregated account until further order of the Court.  For that reason, the Court questions the Firm's assumption that Ms. Caruso shared information regarding the O'Farrells' bankruptcy case merely in an attempt to prejudice them or that such information somehow created a risk of bias.  This is a *bankruptcy* court after all.  If the mere filing of a bankruptcy case compromised the Court's impartiality toward a debtor, the Court would be hard pressed to hear *any* matter that came before it.

The additional comments from the United States Trustee regarding the O'Farrells' upcoming 341 meeting of creditors are, in the Court's view, insufficient to compromise the Court's impartiality.  Ms.  Hinshaw was merely assuring the Court that the United States Trustee intended to inquire about the Sale Proceeds when it conducted the 341 meeting and offered that it was at least possible–as it  presumably is at any meeting of creditors–that the O'Farrells might plead the Fifth. The Court did not acknowledge Ms. Hinshaw's comment in any way or offer any commentary on it.

The Firm also questions Ms. Caruso's motives in sharing that Ms. O'Farrell had been the subject of a state disciplinary action and the effect such information may have had on the Court's impartiality.  Again, full context is important.  The disciplinary action against Ms. O'Farrell involved

41

a flat fee arrangement. The resulting decision by the Indiana Supreme Court in February of 2011 was already known to the Court. The Court reviews *any* disciplinary decision that concerns an attorney or law firm that appears, or has appeared, in this Court. Beyond that, the decision bears on matters this Court has had reason to examine in the not-so-distance past. *See In re ThreeStrands by Grace*, Case No. 12-00756-JKC-11, *Order Granting Application to Employ Taft Stettinius & Hollister LLP as Debtor's Counsel Effective Nunc Pro Tunc to January 31, 2012, In re ThreeStrands by Grace, LLC,* at *3 (June 1, 2012)(citing *In re O'Farrell*, 942 N.E.2d 799, 803 (Ind.2011) for Indiana law regarding flat fees). While the Court cannot conclusively say why Ms. Caruso mentioned Ms. O'Farrell's disciplinary action, the fact remains that she did not tell the Court anything it did not already know and had a legitimate judicial reason to know. As such, the Court cannot conclude that the information would lead a thoughtful observer to reasonably question the Court's impartiality toward the Firm.

Next are the Firm's concerns over the direction given by the Court during the December 13th hearing as to how the parties should proceed. A full and careful review of the Court's discussion with the parties does not support the Firm's characterization that the Court essentially told counsel how to practice law. The December 13th hearing dealt, in large part, with the practical aspects of (1) the Trustee securing the funds then on deposit with the Hamilton Superior Court and (2) how the Roudebushes might best obtain clarification from the Court that the sale of the Property to them was free and clear of liens and encumbrances. With respect to this second issue, it is important to emphasize that the Amended Sale Motion and Sale Order seemingly clearly provide that the Roudebushes purchased the property free of any liens; it appeared to be just a matter of proving that to the state court. Thus, there was much discussion on December 13th as to how the Roudebushes

should proceed, both in this Court and in state court, in their effort to clarify the Sale Order so that it more clearly reflected that the Property had, in fact, been sold free and clear of Citi's mortgage. The remaining issue related to the funds then on deposit with the state court and the Trustee's desire to secure them for her administration as an asset of the Knightons' Chapter 7 estate.[11]

It is not unusual for the Court to engage in such discussions with counsel in the context of estate administration.  It is important to keep in mind that the bankruptcy process is dissimilar in many regards from regular adversarial litigation.  There is often a mutuality of interests and equitable considerations that make the process of discovering, marshaling and distributing estate assets a far less adversarial process than a two-party dispute.  Bankruptcy also often poses far more logistical and procedural issues than regular litigation.  For these reasons, the Court is much more apt to discuss procedural issues with counsel and with litigants and to provide a certain amount of guidance than it would in a two-party dispute.  Such guidance is often a matter of sheer practicality.

Here, the Court merely indicated that it believed the Knighton Chapter 11 was the more appropriate case to address the issues raised by the Clarification Motion and that in order to address those issues in the context of the Knighton Chapter 11, the case would need to be reopened.  It otherwise offered no substantive ruling on the relief requested in the Clarification Motion.  Similarly, in its dialogue with the parties regarding the Trustee's desire to obtain control over the funds on deposit with the state court, it offered no substantive opinion as to how those funds should be distributed or who, if anyone, had a superior claim to them.  It merely discussed the various in ways

_____

[11]  It should be noted that the Firm has consistently supported the Roudebushes' insistence that they purchased the Property free and clear of Citi's mortgage. The Firm has also seemingly agreed that the balance of the Sale Proceeds that were on deposit with the state court as of December 13th are property of the Knighton Chapter 7.  Thus, it is difficult to understand what objection the Firm has to the procedural matters discussed on December 13th as to those issues.

the Trustee could go about securing the funds.

The Firm takes issue with the fact that the Court accepted counsels' "unsworn," statements as fact. This Court frequently hears argument from counsel in the place of live testimony or evidence. Certainly, it is not uncommon for attorneys to explain the factual background of an issue or matter before the Court. It is also not uncommon for the Court to base a ruling on such explanations or to enter into a dialogue with counsel as to how the matter should proceed. While the Court did not dismiss what was discussed at the December 13th hearing or take counsels' allegations and representations lightly, it again must be emphasized that it issued no substantive ruling, let alone an adverse one to the O'Farrells or the Firm, on December 13th. Rather, it directed the parties to cue up the matters at issue in the Knighton Chapter 11, the case in which the Firm was counsel of record such that it would receive formal notice of any further activity and would be given an opportunity to be heard as to matters concerning the Sale Order and the Sale Proceeds.

Ideally, a representative from the Firm or its counsel would have been present at the December 13th hearing, and the Court as much as acknowledged that by inviting their attendance. However, the primary thrust of the Clarification Motion and the Chapter 7 Stay Motions concerned *Citi's* actions in pursuing its foreclosure action against the Knightons, and not the Firm's or the O'Farrells' handling of the Sale Proceeds. Thus, the Court was not under the impression that formal notice of the hearing to the Firm or its attendance at the hearing was critical. That said, the Court rejects the Firm's contention in the Recusal Motion that the Firm lacked standing to seek a continuance of the December 13th hearing.[12] Presumptively, any party can appear and be heard in a bankruptcy case unless and until someone challenges their standing to do so. There is no reason

---

[12] The Court notes that the Firm is scheduled as a creditor in the Knighton Chapter 7.

to believe that the Court would have summarily denied a motion to continue based on a lack of standing had the Firm filed one. Beyond that, the mere fact that the Firm and the O'Farrells were *discussed* at the hearing does not necessitate disqualification. *Yet again*, it must be emphasized that the Court took no substantive action against either the Firm or the O'Farrells at the hearing, and there is nothing to suggest that its impression of them was prejudiced by what was said at the December 13th hearing.

Finally, the Court addresses the Firm's argument that the Court improperly directed the parties to seek transfer of the O'Farrell case from the Honorable Robyn L. Moberly. As discussed at the December 13th hearing, the Court believed that there might be some intersection of issues between the Knighton cases and the O'Farrell Chapter 7. The Court also believed that there could be some administrative benefit to having the same judge handle all of the cases. While Ms. Hinshaw indicated that she had never moved for an intradistrict transfer, it is not unprecedented for the judges in this district to transfer, *sua sponte*, related or connected cases to one another. There was nothing said at the December 13th hearing to suggest that the Court had an improper motive for wanting the case transferred. The Court does not believe that a "thoughtful observer" would read any risk of bias into the transfer of the O'Farrell case to this Court. As explained below, this is especially true since there is nothing in the Court's handling of the the O'Farrell case *after* the transfer that has unfairly prejudiced them or otherwise suggests a risk of bias.

Based on the foregoing, the Court denies the Firm's request that it disqualify itself pursuant to 28 U.S.C. § 455(a).

## 28 U.S.C. § 455(b)(1)

Under 28 U.S.C. § 455(b)(1), a judge must recuse himself when he "has a personal bias or

prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." "In determining whether a judge must disqualify himself under 28 U.S.C. § 455(b)(1), the question is whether a reasonable person would be convinced the judge was biased." *Hook*, 89 F.3d at 355 (internal quotation omitted). Recusal under § 455(b)(1) "is required only if actual bias or prejudice is proved by compelling evidence." *Id.*

The Supreme Court has explained that neither judicial rulings nor opinions formed by the judge as a result of current or prior proceedings constitute a basis for recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see also Hook*, 89 F.3d at 355 ("[J]udicial rulings are grounds for appeal, not disqualification"). Furthermore, "expressions of impatience, dissatisfaction, annoyance, and even anger" do not justify requiring recusal. *Liteky* at 555-56, 114 S.Ct. 1147. In claims arising under § 455(b)(1), the mere fact that a judge forms a negative opinion of a litigant during the course of a proceeding does not, by itself, constitute bias. *In re Huntington Commons Assocs.*, 21 F.3d 157, 158 (7th Cir.1994) (quoting *Liteky v. United States*, 510 U.S. 540, 555-56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).

In reviewing the Firm's Recusal Motion, it is not clear what evidence it relies upon, compelling or otherwise, of actual bias. As already set forth above, their basis for claiming that the Court, through staff counsel, engaged in *ex parte* conversations is not supported by the only evidence they point to for such claim. The Firm points to no personal knowledge of a disputed material fact or to any antagonistic, malicious or hostile comment from the bench or within a ruling. True, they point to two allegedly prejudicial comments made to the Court by Ms. Caruso and Ms. Hinshaw, but there is nothing in the Court's response to those comments or its subsequent actions that suggest that

46

they served to color the Court's opinion or actions. The balance of their allegations relate to judicial rulings that, as the standard above indicates, generally cannot provide a basis for recusal under 28 U.S.C. § 455(b)(1).

Even assuming that the Court's rulings could form a legitimate basis for disqualification, the Firm points to no adverse ruling within the O'Farrell case that supports the conclusion that the Court is biased. Again, the Court disagrees that the mere transfer of their case from Judge Moberly suggests a risk of, or actual, bias, and the activity in the case since it was transferred provides no support for the Firm's Recusal Motion either. To date, the Court has issued only one ruling adverse to the O'Farrells in their case. Specifically, the Court overruled their objection to a motion filed by the National Bank of Indianapolis on January 4, 2013, to extend the time to file a complaint under 11 U.S.C. § 523 and § 727. Such motion was filed prior to the O'Farrells' scheduled § 341 meeting of creditors and prior to the filing of the O'Farrells' schedules. In the Court's view, Debtor's objection to it–that the bank had already had more than adequate time to file a complaint–was simply without merit.[13] Nearly everything else that has transpired in their case–including repeated requests by any number of parties to extend the deadline to file an action under 11 U.S.C. §§ 523 and/or 727–have been granted in favor of those parties, not because of any bias but because they were unopposed.

At the close of the hearing on the Recusal Motion, there was a comment made that but for this Court's handling of their case, The O'Farrells would have already received a discharge by now.

---

[13] The Court, following a hearing on March 6, 2013, overruled the O'Farrells' objection to a stay motion filed by the Roudebushes. As is reflected by the record of that hearing, The O'Farrells and the Roudebushes eventually agreed to such relief per the terms of the order that was jointly reviewed by them and submitted to the Court.

There is no evidence in the record to suggest that is true. The Court has held nothing up that the the O'Farrells are otherwise entitled to. The discharge has been delayed because, as indicated above, multiple parties–including some that are otherwise not involved in the Knighton cases–have sought multiple extensions under Federal Rule of Bankruptcy Procedure 4004 and 4007. Contrary to what the Firm or the O'Farrells may think, the Court did not instigate or escalate the dispute between Citi, the Roudebushes, the Knightons, Ms. Caruso and the Firm; that dispute arose well before the December 13th hearing. And even if the Court were otherwise uninvolved in adjudicating that dispute, it presumes that the parties would have taken the very same steps to preserve their claims against the O'Farrells were this case still in front of Judge Moberly.

The rulings the Court has issued in the Knighton Chapter 11 and its comments from the bench, while occasionally critical of the Firm, are insufficient to require disqualification. The statements made by the Court regarding the Firm's actions in this case and their failure, to date, to provide a full and accurate accounting are not disproportionate to what the Court has learned in the course of this proceeding and do not reveal a "deep-seated antagonism." The Court notes that, to date, it has done little more than clarify its own Sale Order–something well within its purview–and to instruct the Firm and the O'Farrells, *as principals of the Firm,* to account for and turnover the Sale Proceeds. The Court has specifically reserved other substantive decisions pending further fact-finding regarding the parties' respective rights to the Sale Proceeds. The Court has issued no ruling as to whether the Firm and/or the O'Farrells misappropriated any of the Sale Proceeds or otherwise engaged in improper conduct. It has simply taken steps to secure the Sale Proceeds and to understand what happened to them after dismissal of the Knighton Chapter 11. The Court has made it clear that while it is "appalled" with how the Firm or Citi proceeded following dismissal of the

Knighton Chapter 11, it "fully intends to provide the parties with a full and fair opportunity to address those issues." *Order Clarifying Court's Order of December 3, 2008* at *6-7. There is nothing in the record to suggest that the Court has limited the parties' ability to be heard on these issues or has otherwise failed to honor its promise for a full and fair adjudication. Rather, the record reflects that resolution of these matters has stalled for reasons out of the Court's control.

Certainly, the O'Farrells and/or the Firm have been free to challenge any of the decisions rendered by this Court that they consider substantively or procedurally incorrect or premature. To date, no appeal has been filed and, save for the Motion to Reconsider, neither the O'Farrells nor the Firm have sought relief from any ruling in either this case or the O'Farrell case under Federal Rule of Bankruptcy Procedure 59 or 60. While Mr. McClure, on behalf of either the Firm or the O'Farrells, has made various comments that the Court has wrongly pursued its inquiry in light of the automatic stay in this case and within the context of the Knighton Chapter 11, to date, no formal motion has been filed to extend the automatic stay to the Firm or to determine whether the stay protects the O'Farrells in their representative capacity as shareholders, officers and/or directors of the Firm.

### 28 U.S.C. § 455(b)(5)(iv)

The Firm does not specifically cite to or quote § 455(b)(5)(iv) in their Recusal Motion. However, they do argue that the Court must recuse because "Judge Coachys participated in the *ex parte* conversations that occurred" at the December 13, 2012 hearing and, therefore, "will be a witness" in the Stay Violation Adversary.

Recusal under § 455(b)(5)(iv) is mandatory. *See United States v. Tucker*, 78 F.3d 1313, 1326 (8th Cir.1996). The purpose of this mandatory disqualification provision is "to prevent a judge from

49

having to pass on the competence and veracity of his own testimony given with respect to a matter presently [sic] in controversy before him." *In re A.H. Robins Co., Inc.*, 602 F.Supp. 243, 250 (D.Kan.1985) (quoting *In re Continental Vending Mach. Corp.*, 543 F.2d 986, 995 (2d Cir.1976)). Nevertheless, an assertion that a judge will be a material witness does not lead automatically to disqualification. *See U.S. v. Rivera*, 802 F.2d 593, 601 (2d Cir.1986). Neither is a judge "compelled automatically to accept as true the allegations made by the party seeking recusal." *In re Martinez–Catala*, 129 F.3d 213, 220 (1st Cir.1997). In fact, a judge is presumed impartial unless the movant can demonstrate through the facts of the case that the criteria for an automatic recusal are met. *See Matter of Horton*, 621 F.2d 968, 970 (9th Cir.1980). "To the extent that facts are in dispute, factual determinations are made by the judge whose recusal is in question, and the same judge also decides whether the facts trigger disqualification, subject always to review on appeal, normally for abuse of discretion." *In re Martinez–Catala*, 129 F.3d at 220 (citing *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1460 (1st Cir.1992)). Therefore, the Court shall examine the factual basis for the Firm's assertion that Judge Coachys and/or his staff counsel are likely to be called as material witnesses.

The Court questions the Firm's claim that it will be called to testify as to the December 13th hearing. The transcript of that hearing speaks for itself; there is nothing more the Court can add to it. There were also several others present at the hearing, all of whom can presumably testify as to what occurred at the hearing. The Firm has otherwise stated no compelling reason to believe that the Court will be a *material* witness in the Adversary Proceeding and, for that reason, it rejects their argument that recusal is required pursuant to § 455(b)(5)(iv). *See Adrian v. Mesirow Financial Structured Settlements, LLC*, 588 F.Supp.2d 216, 222 (D.Puerto Rico,2008) (court rejects argument

that disqualification was required under § 455(b)(5)(iv) where settlement meetings at issue had been duly recorded and attended by numerous other individuals; any testimony that could be given by judge "would not be crucial or non-cumulative.").

The Firm's argument that the staff counsel must have had *ex parte* conversations with other parties prior to the December 13th hearing is also without merit. As the only proof of that allegation, they point to the email sent to Mr. O'Farrell in advance of that hearing, arguing that there was information contained in the email that must have come from sources other than the pleadings and documents already on file with the Court. Contrary to the Firm's argument, every bit of information contained in staff counsel's email to Mr. O'Farrell was *easily* gathered from the schedules and pleadings already on file in the Knighton Chapter 11 and/or Knighton Chapter 7.[14] The public record in these cases was the only source of staff counsel's email to Mr. O'Farrell. And the statement that the Court "may have to reopen the 2007 case . . . ." was merely a reflection of the Court's initial impression that the issues raised by the Clarification Motion were likely better addressed within the Knighton Chapter 11, i.e., the case in which the Sale Order was issued and the Sale Proceeds obtained. Beyond that, the Court categorically denies the suggestion that staff counsel, or the Court, discussed the matters set for December 13th with anyone other than the Firm.

Even assuming that the Court or staff counsel are eventually and legitimately[15] called as

---

[14]  Specifically, the information was gathered from Schedule D, Citi's Response to the original Motion to Sell, the Amended Motion to Sell, and Sale Order in the Knighton Chapter 11, and from the Stay Motions, the Objections thereto, and the Clarification Motion in the Knighton Chapter 7.

[15]  If a party needed to merely threaten naming the Court or its personnel as a witness, it would be all too easy for a party to manufacture grounds for recusal under 28 U.S.C. § 455(b)(5)(iv). The Seventh Circuit has rejected similar efforts. *See In re Specht*, 622 F.3d 697, 700 (7th Cir.2010) (the mere filing of a motion to add a party that could create grounds for disqualifying was insufficient; motion would have to be granted for disqualification to be required).

witnesses, the Court would be inclined to recuse only with respect to the Stay Violation Adversary, and not this case or the O'Farrell bankruptcy case, absent some other compelling reason to do so. Based on the foregoing, the Court denies the Firm's request that it disqualify itself pursuant to 28 U.S.C. § 455(b)(5)(iv).

### Conclusion

In conclusion, the Court holds recusal is not warranted or required under 28 U.S.C. § 455(a), (b)(1) or (b)(5)(iv).  Accordingly, the Court denies the Recusal Motion.

###